**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CHERYL ANDERSON, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | No. 12 C 00627 |
| | ) | |
| OFFICE OF THE CHIEF JUDGE OF THE | ) | Judge John J. Tharp, Jr. |
| CIRCUIT COURT OF COOK COUNTY, | ) | |
| ILLINOIS, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Cheryl Anderson was a Juvenile Probation Officer employed by the Office of the Chief Judge of the Circuit Court of Cook County, Illinois until she was fired for her fifth unauthorized absence when she left work on August 1, 2011, rather than meet with her supervisors as she had been instructed. Anderson claims she was fired not because of her absences but in retaliation for her complaints about discrimination she encountered while working in the Juvenile Probation Department. She has failed to adduce evidence of racial discrimination or retaliation that would be sufficient to support a reasonable jury verdict in her favor, however, so the Court grants the defendant's motion for summary judgment as to each of her claims.

## I. BACKGROUND[1]

In November 1988, Cheryl Anderson became a Cook County Probation Officer. Pl.'s 56.1 Resp. ¶ 1. Twenty years and two EEOC complaints later,[2] Anderson was transferred to the Cook County Juvenile Probation Department ("JPD") in July 2008. *Id.* ¶¶ 9-11. This transfer was a term of the settlement agreement in the most recent of Anderson's prior discrimination cases. Anderson worked as a juvenile probation officer in the Englewood East Unit of the JPD until her termination in August 2011. *Id.* ¶¶ 9-11, 53.

Anderson recites a litany of alleged discrimination and harassment to which she was subjected during her employment with the JPD. She claims that:

- she was assigned to a non-functional computer—but she also admits that all officers were required to share computers because there were not enough to go around;

- she was prevented from staying at work late to use working computers—but she also admits that she was not compliant with her regular work schedule and requested overtime that was not allowed under the applicable collective bargaining agreement;

- she was denied opportunities to attend training events when Caucasian employees were permitted to attend those same training events—but she also admits that training requests were vetted in a uniform manner and were subject to capacity and budget constraints and that permission to attend

---

[1] The following facts are drawn from the admissions in the Plaintiff's Response to the Defendant's Local Rule 56.1(a)(3) Statement of Undisputed Material Facts ("Pl.'s 56.1 Resp."), Dkt. 54, and the properly supported assertions in the Plaintiff's Local Rule 56.1(b)(3)(C) Statement of Additional Facts ("Pl.'s 56.1 Stmt."), Dkt. 54. As it must on a motion for summary judgment, the Court construes the evidence in favor of the plaintiff, who is the nonmoving party. *See Majors v. Gen. Elec. Co.*, 714 F.3d 527, 532 (7th Cir. 2013).

[2] Anderson filed two charges of discrimination with the EEOC in 2007 and 2008 against the Cook County Adult Probation Department, her employer at the time, alleging race discrimination, harassment, and a hostile work environment. First Am. Compl. ¶ 18. Both cases settled with Anderson returning to work. Pl. Resp. (Dkt. 53) at 2.

training requests were not honored where performance deficiencies or non-compliance with department standards were at issue;[3]

- she was denied transfer requests to the department's Mental Health Unit—but she admits that her requests were untimely, were not for positions for which she had the requisite skills, and/or were not for open positions.

*Id.* ¶¶ 18-19, 21-24, 42-43, 63.

Anderson also alleges several instances when her employer treated Caucasian employees more favorably than her. She alleges that a Caucasian supervisor, who Anderson once complained harassed her and discriminated against her, was promoted. Next, she alleges that there were unfair promotion and firing practices in place in the 1990s. *Id.* ¶¶ 9, 20, 26. Anderson also claims that a Caucasian female officer was not disciplined by Michael Rohan, the Director of the Juvenile Probation Department, "to protect her career." *Id.* ¶ 25. Anderson asserts that she received positive performance evaluations which certain unidentified employees then attempted to change,[4] a fact the defendant does not dispute. Def.'s 56.1 Resp. ¶ 77. And Anderson identifies one Caucasian male officer, Brian Majewski, as being permitted to attend all requested training events and another Caucasian male officer, "Steven," as having less seniority compared to Anderson but nevertheless being permitted to transfer to the Mental Health Unit. Pl.'s 56.1 Resp. ¶¶ 22-24.

In April 2011, Anderson filed with the EEOC a discrimination charge against the Juvenile Probation Department. She alleged that the JPD created a hostile work environment and retaliated and discriminated against her on the basis of her race and because she filed previous discrimination charges with the EEOC. First Am. Compl. ¶¶ 20-21.

---

[3] There is also record evidence that Anderson did attend at least some training. *See, e.g.*, Dkt. 48-4 at 2 (documenting attendance at training session on November 3, 2010).

[4] Anderson briefly mentions in her opposition brief that Rohan and her supervisor, Ore Jones, were responsible for making changes to her performance evaluations. Pl.'s Resp. at 12.

The defendant counters Anderson's claims of discrimination, harassment, and retaliation with evidence of a long history of work performance issues, unscheduled absences, and disciplinary action. Most significantly, during a routine annual audit of the Englewood East Unit in 2010, auditors revealed "substantial concerns" with two folders assigned to Anderson. Pl.'s 56.1 Resp. ¶ 54. The JPD initiated a "full folder audit" of Anderson's caseload on December 4, 2010. *Id.* Meanwhile, Anderson's supervisor, Ore Jones, issued a number of memoranda to Anderson regarding her performance issues, including failure to maintain contact with juveniles on probation assigned to her, missing time sheets and case logs, discrepancies on time sheets and case logs, cases that were overdue for assessment, and non-compliance with various department protocols. *Id.* ¶ 55.

Between February and May 2011, Anderson was "in 24 pre-disciplinaries" (apparently disciplinary meetings) and was disciplined by Jones once a week for four months—facts that Anderson admits. *Id.* ¶ 29. During this period, from April 4 to April 8, Anderson received her first of two suspensions, a five-day suspension without pay. The suspension was for "egregious unprofessional behavior and conduct unbecoming an officer because she brought inappropriate and slanderous allegations against [her supervisor] Jones." *Id.* ¶ 45. This explanation refers to an internal complaint or complaints that Anderson filed against Jones in February 2011, complaining that Jones made "negative and inappropriate statements" about Anderson during a staff meeting (including "I needed to start doing my work" and "Why would I take your cases when you don't do your work?"), "constantly belittle[d] and ma[de] illicit [sic] statements about co-workers and even to children [sic],"[5] refused to give her a timesheet, and refused to relinquish her pay stub. Dkt. 48-5 at 14-15. *Id.* ¶ 45. The deputy director of the department concluded that

---

[5] The comment on which this claim was based allegedly accused another probation officer of "having sex with little boys." Dkt. 48-5 at 15.

Anderson's allegations against Jones were unfounded and recommended corrective action against Anderson "for bringing inappropriate and slanderous charges against DCPO Jones. She has submitted several slanderous memorandums [sic] which contain false or inaccurate accusations and are intended to defame the character of her co-workers." *Id.* at 16. The JPD, and Human Resources Director Rose Golden, ultimately concluded that Anderson intentionally defamed the character of Jones and that this was "egregious unprofessional behavior and conduct unbecoming an officer." *Id.* at 18-19. As a result, the JPD suspended Anderson for five days without pay. *Id.* at 19.

As additional examples of the sort of wild allegations Anderson was making, the defendant points to two incidents in 2010. The first involved an October 2010 text message that read:

> Good morning. My name is Cheryl Anderson, a Juvenile Probation officer. I was forced to transfer from Adult for challenging Management for the same type of Racist Practices to Juvenile 2 years ago. I am Protesting the same type of Discriminatory Practices!!! Juvenile Probation Director Mike Rohan only disciplines and fires Blacks! Judge Evans refuses to address him or discipline him irrespective of the number of complaints lodged against him!!! Mike Rohan is a bigot, racist, and a misogynist!!! Hitler like tactics are not acceptable!!! A few brave souls will March in front of the Juvenile Probation Department. If you can please meet me there at 2245 West Ogden side @ 1:00 pm Today!!!! Our slogan is Mike Rohan must GO!!!! Today!

Anderson testified at her deposition that she either did not remember writing or sending this text message, but acknowledged that she held a few protests against Rohan. Pl.'s 56.1 Resp. ¶ 33. Second, the defendant points to a poster, which Anderson admits ("I would say yeah") she wrote, that stated, "Call the Chief Judge and tell him Director Rohan must go. We understand that you are fearful of this monster." *Id.* ¶ 32.

Following the conclusion of the audit of her cases, and a month after the first suspension, Anderson was suspended again, from May 12 through May 27, 2011 (twelve days without pay)

for "purposeful chronic non-compliance with multiple department standards." *Id.* ¶¶ 46, 56. On July 29, 2011, Jones wrote a memorandum to Anderson detailing a corrective action plan to address her work performance issues. *Id.* ¶ 57.

Anderson also had a history of unauthorized absences from JPD. The absences began on her very first day of work, July 21, 2008. Anderson, along with others who had reported for training,[6] were tasked with moving boxes containing dormant files. Anderson asked to be assigned to some other task, but her request was denied; shortly thereafter, she reported that she felt ill and left work. She did not return to work until October 3, 2008. Pl.'s 56.1 Resp. ¶¶ 13-15, 64; Dkt. 48-5 at 8.

Anderson also took unscheduled absences during the following time periods: (1) in June 2010 for several days, immediately after a meeting with supervisors regarding her casework; (2) from December 23, 2010, until January 21, 2011, also immediately following a meeting with supervisors; and (3) from the end of June 2011 until the August 1, 2011, again immediately after a meeting with supervisors. Pl.'s 56.1 Resp. ¶¶ 64-66, 68. Anderson used a combination of accrued vacation, sick and personal days to cover most of these absences, *id.*, but near the end of July 2011, Anderson had exhausted all of her accrued leave and was "off without pay" for the last few days of July. *Id.* ¶ 68.

Anderson returned to work briefly on August 1, 2011. Upon her return, Anderson was informed that her supervisors wished to meet with her that afternoon, but Anderson left and never returned. *Id.* ¶ 69. Anderson asserts that she "told her employer that she was going to the

---

[6] Anderson took umbrage at being required to go through training before beginning her duties in JPD, but so far as the record reflects she had no experience working with juveniles and there is no evidence that the training requirement was applied in a discriminatory fashion. To the contrary, one of Anderson's complaints is that she was not provided with *more* training opportunities.

doctor in order to obtain blood pressure medication." *Id.* Anderson then sent a letter to Chief Judge Evans requesting an emergency leave to begin August 1, 2011, and to end April 1, 2012. *Id.* ¶ 70. Rose Golden, the department's Human Resources director, wrote to Anderson on August 8, explaining to her that she had exhausted her leave time and that she could seek medical leave if necessary. *Id.* ¶ 71. Anderson did nothing further to obtain leave. On August 29, 2011, Rohan sent a letter to Anderson informing her that since she had remained off work without authorization since August 1, 2011, despite being advised that she had no more accrued time to cover the absence, and because she did not apply for disability leave, her seniority was terminated effective that day. *Id.* ¶ 47.

Anderson maintains that Rohan, Golden, and Jones were involved in the decision to terminate her, but admits in her Local Rule 56.1 Responses that neither Rohan nor Golden "consider[ed] race in making any decision regarding [her] discipline or termination." ¶¶ 49. 73. As to Jones, she maintains only that "she felt her termination was an act of retaliation," ¶ 59, but her response does not indicate what the termination was purportedly in retaliation for; to the contrary, her responses expressly acknowledge that "Jones recommended that [Anderson] be terminated because she violated the CBA due to her unauthorized absence in August 2011."[7]

As discussed above, on February 1, 2011, Anderson submitted a complaint to the JPD complaining about Jones' allegedly inappropriate statements. Dkt. 48-5 at 14. Anderson's allegations were investigated and rejected in a written memorandum on March 17, 2011. Anderson attended a pre-disciplinary meeting on March 29, 2011 and was suspended from April

---

[7] *See also* Pl.'s 56.1 Resp. ¶ 72 ("Golden [the Human Resources director] recommended that she be terminated because she violated the CBA due to her unauthorized absence in August 2011.").

4 to 8, 2011. Also in April 2011, Anderson filed a charge of discrimination with the EEOC.[8] The

EEOC issued a "right to sue" letter to Anderson on October 31, 2011. Dkt. 23-1 (Ex. A).

Anderson filed this lawsuit on January 27, 2012.

## II.    DISCUSSION

Summary judgment is proper where "the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a). The purpose of summary judgment is to determine if "the evidence is such that a

reasonable jury could return a verdict for the nonmoving party." *See Fleishman v. Cont'l Cas.

Co.*, 698 F.3d 598, 604 (7th Cir. 2012) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

248 (1986)). "A court must grant a motion for summary judgment against a party who fails to

make a showing sufficient to establish the existence of an element essential to that party's case,

and on which that party will bear the burden of proof at trial." *Everett v. Cook Cnty.*, 655 F.3d

723, 726 (7th Cir. 2011) (quoting *Bio v. Fed. Express Corp.*, 424 F.3d 593, 596 (7th Cir. 2005)).

In evaluating a motion for summary judgment, the Court "must construe all facts and

draw all reasonable inferences in the light most favorable to the nonmoving party." *Majors v.

Gen. Elec. Co.*, 714 F.3d 527, 532 (7th Cir. 2013) (quoting *Goetzke v. Ferro Corp.*, 280 F.3d

766, 774 (7th Cir. 2002)). Even so, the nonmoving party "must do more than simply show that

there is some metaphysical doubt as to the material facts." *Morgan v. SVT, LLC*, 724 F.3d 990,

997 (7th Cir. 2013) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S.

574, 586 (1986)). "The mere existence of a scintilla of evidence in support of the [nonmovant's]

position will be insufficient; there must be evidence on which the jury could reasonably find for

the [nonmovant]." *Stephens v. Erickson*, 569 F.3d 779, 786 (7th Cir. 2009) (quoting *Anderson*,

---

[8] The Court cannot locate in the record the exact date on which Anderson filed her charge
of discrimination with the EEOC in 2011.

477 U.S. at 252). For each of the claims in this case, Anderson fails to identify sufficient evidence and thus fails to avoid summary judgment in the defendant's favor.

### A. Race Discrimination (Count I)

Anderson alleges in her complaint that she was discriminated against on the basis of her race when her supervisors in the JPD denied her merit pay increases,[9] training, promotions, and transfers, subjected her to different terms and conditions of employment compared to white colleagues, and ultimately terminated her in August 2011. Pl. First Am. Compl. ¶¶ 18, 21.

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). A plaintiff may use either the direct method or indirect method of proof under the *McDonnell Douglas* framework to avoid summary judgment on a race discrimination claim. *See Coleman v. Donahoe*, 667 F.3d 835, 845 (7th Cir. 2012); *see also Atanus v. Perry*, 520 F.3d 662, 671–72 (7th Cir. 2008) (discussing the direct and indirect methods of proof). Anderson appears to be proceeding under the indirect method of proof, which is the sole method she applies to her case in her response brief. Pl. Resp. at 5-6.

Under the indirect method of proof, a plaintiff must first establish a *prima facie* case of discrimination by showing that (1) she is a member of a protected class; (2) her job performance met her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) her employer treated similarly situated individuals outside of the protected class more favorably. *Donahoe*, 667 F.3d at 845 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792,

---

[9] Anderson appears to have abandoned her claim that she was discriminatorily denied merit pay increases, as she does not discuss such a claim in her brief (her only reference to the topic is that she "consistently" *received* merit pay increases (Pl. Resp. at 6-7)) and she has adduced no other evidence regarding compensation issues.

802–04 (1973)). If the plaintiff establishes all four elements, a rebuttable inference of discrimination arises, and the burden shifts to the employer to offer a legitimate, nondiscriminatory reason for the adverse employment action. *Id*. If the employer meets this burden, the burden shifts back to the plaintiff to prove that the proffered reason is pretext, allowing an inference of discrimination. *Id*.

The parties do not dispute that Anderson is African American and therefore a member of a protected class. Def. Br. (Dkt. 48) at 4. The parties also do not dispute that the termination of Anderson's employment qualifies as an adverse employment action. *Id*.[10] Anderson's discrimination claim fails, however, on the other two elements of her prima facie case.

### 1. Anderson did not meet the legitimate expectations of her employer.

It is abundantly clear that Anderson was not meeting the legitimate expectations of her employer when she was terminated. Anderson had been AWOL for a month when she was terminated, and she plainly was not meeting JPD's legitimate expectations when she was not even showing up for work. "[A]n employer has a legitimate interest in insuring that each employee's work continues at a steady pace … Reliability and promptness are important considerations in maintaining a work force." *Oates v. Discovery Zone*, 116 F.3d 1161, 1171 (7th Cir. 1997) (citation and internal quotation marks omitted). Anderson's argument that she received several positive performance reviews while at JPD has no bearing on this question.[11]

---

[10] Anderson also maintains that the denial of training opportunities constituted an adverse employment action, but since she failed to adduce any evidence of the nature or significance of the training opportunities she was denied, there is no factual basis on which to sustain such a finding. *See Chaib v. Indiana*, 744 F.3d 974, 982-83 (7th Cir. 2014) (the failure or refusal to train an employee based on that employee's membership in a protected class can be an adverse employment action).

[11] Anderson has not produced any such reviews, and has offered no evidence of what the reviews said about her performance other than her general characterization of the reviews as "positive."

When considering whether an employee is meeting an employer's legitimate expectations, courts look to whether the employee "was performing adequately ***at the time of the adverse employment action***." *Dear v. Shinseki*, 578 F.3d 605, 610 (7th Cir. 2009) (citing *Hong v. Children's Mem. Hosp.*, 993 F.2d 1257, 1262 (7th Cir. 1993)) (emphasis added). The relevant question is not whether Anderson had met JPD's legitimate expectations in the past, but whether in light of her unexcused absences in late July and most of August, Anderson was meeting JPD's legitimate expectations when JPD terminated her in late August. In light of her unauthorized and lengthy absence, no reasonable jury could conclude that she was.[12]

In any event, to the extent that Anderson wants to stand on her overall record at JPD to show that she was meeting legitimate expectations, she fares no better. In addition to her other lengthy unscheduled absences,[13] the defendant has produced evidence (most of which is uncontradicted) of Anderson's poor performance and disruptive influence, both of which led to suspensions, first for "egregious unprofessional behavior and conduct unbecoming an officer because she brought inappropriate and slanderous allegations against [her supervisor] Jones" and then again for "purposeful chronic non-compliance with multiple department standards." Pl.'s 56.1 Resp. ¶¶ 45, 55-56.

Indeed, the record reflects a wholesale failure on Anderson's part to perform the duties of her position. Anderson's responsibilities as a juvenile probation officer included assessing each individual probationer and his or her family situation, developing a treatment and supervision

---

[12] That Anderson absented herself on August 1 as soon as she was told that her supervisors wanted to meet with her to discuss work performance issues (as she had done on prior occasions) only reinforces the point. There is no basis in the record to infer that the supervisors wanted to meet in order to complement her performance.

[13] Over the course of her three years with JPD, Anderson took four lengthy unscheduled absences. Pl.'s 56.1 Resp. ¶¶ 13-15, 64-68. Dkt. 48-5. These absences were "covered" by accrued leave of one sort or another, but there is no dispute that Anderson took the leaves without obtaining authorization from her supervisors before absenting herself from work.

plan appropriate to each case, regularly visiting with the individual and family to supervise the individual's progress, and reporting on each case to the Juvenile Court as required. *Id.* ¶ 38. According to Department Policy 2.19, a juvenile probation officer must make reasonable attempts to establish contact with an individual within 48 hours of receiving a case. Dkt. 48-4 at 15-16. For moderate risk cases, the officer must make monthly in-person contacts as well as monthly contact with the individual's parent and school. *Id.* at 16. Low risk cases require once every-other-month in-person contact with the individual and monthly contact with the individual's parent and school. *Id.*

There is extensive evidence in the record before this Court that Anderson did not fulfill these responsibilities. For example, on March 1, 2011, Anderson had 23 cases that were overdue for reassessment, inaccurate classifications for six cases, and three missing case logs (by April 1, 2011, Anderson had sixteen missing case logs). Dkt. 48-4 at 5, 28. Based on a review of Anderson's case logs, as of March 1, 2011, Anderson had initiated no documented contact with several individuals since being assigned their cases in November and December 2010, and otherwise had no monthly or bimonthly contact in dozens of cases. *Id.* at 6-11. One high risk individual had no in-person contact with Anderson for three months, and no parent or school contact at all. *Id.* at 7. Another moderate risk individual began to skip school in December 2010 because of a death from gun violence in his family. *Id.* at 8. As of March 1, 2011, Anderson had submitted no documentation that she had any contact with the individual since a phone call in December. *Id.* These are just two of the dozens of cases detailed in the March 2011 memoranda to Anderson. As a corrective measure, Anderson was directed to meet in-person with 18 minors (she then failed to meet with 7), in-person with 5 parents (she then failed to meet with 4), and on the telephone with 13 parents (she then failed to call 7). *Id.* at 25. She was also directed to visit

schools regarding 17 individuals (she failed to visit regarding 10). Anderson did not comply at all with 59% of the corrective directives she was given in March 2011. *Id.*

It is noteworthy that Anderson does not attempt to counter any of this evidence, except to assert in generic terms that the suspensions and the memoranda detailing the shortcomings in her work performance reflected, from her perspective, harassment. Pl.'s 56.1 Resp. ¶¶ 55. Insisting that a probation officer establish and maintain contact with probationers, however, is not harassment. Anderson has failed to establish that she was meeting the legitimate expectations of her employer—namely, she either failed to document or simply did not do her job as a juvenile probation officer. When confronted with these failings, Anderson took off on long unscheduled absences. It was the final unscheduled absence that resulted in Anderson's termination because she had not accrued enough leave time. In light of this record, Anderson plainly was not meeting her employer's legitimate expectations. *See Williams v. Airborne Exp., Inc.*, 521 F.3d 765, 768 (7th Cir. 2008) (holding that plaintiff with record of repeated disciplinary action and insubordination did not show that he was meeting his employer's legitimate job expectations). Indeed, Anderson is fortunate that she was not terminated sooner than she was.

## 2. Anderson has not identified any similarly-situated employees who were terminated after unscheduled and uncovered absences from work.

In deciding whether someone is "similarly situated," courts conduct a "flexible, common-sense examination of all relevant factors." *Donahoe,* 667 F.3d at 846 (citation and internal quotation marks omitted). To be similarly situated, an employee must be "directly comparable to the plaintiff in all material respects." *Id.* (citation and internal quotation marks omitted). A court's inquiry on this point should not be mechanical, but typical cases require a plaintiff to show "that the comparators (1) dealt with the same supervisor, (2) were subject to the same

standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Id.* (citation and internal quotation marks omitted).

Anderson has not identified any similarly-situated employees who disappeared from work for one month without any notice or accrued leave to cover the time off, and who were not fired as a result. Anderson discusses three putative comparators—(1) Phil Loizon, a former supervisor who was promoted; (2) Brian Majewski, a coworker who allegedly attended all of the training sessions he requested; and (3) "Steven," who was transferred to the Mental Health Unit with allegedly less seniority than Anderson—but Anderson does not claim that any of these three were terminated after unscheduled, unexcused absences, as she was. Since termination is the only adverse employment action Anderson has established (*see* note 9 *supra*), that is the end of this Court's inquiry regarding similarly-situated employees. In any event, Anderson adduces no evidence that would establish that she was similarly situated to these employees: Loizon was more senior and experienced, a former supervisor; Anderson tells us nothing about either the nature or number of training opportunities that Majewski received, much less about whether she even applied, or was eligible, to attend them; and she cannot even identify "Steven" by his full name, let alone describe why she was more qualified for the transfer he received than was she. Similarly, Anderson's more general claims about favorable treatment received by other white employees (*see supra* at 3) do not begin to establish that those employees were similarly situated to Anderson. *See Oest v. Ill. Dep't of Corr.*, 240 F.3d 605, 614 (7th Cir. 2001) (finding that a plaintiff's "uncorroborated, conclusory statements that similarly situated coworkers were treated differently," without specific evidence, were insufficient to support a Title VII claim).

In sum, Anderson has failed to offer sufficient evidence on which a reasonable jury could find in her favor on her discrimination claim under the indirect method. Anderson cannot succeed on her race discrimination claim and the defendant is entitled to summary judgment on Count I.[14]

### B. Hostile Work Environment (Count I)

Anderson also alleges that she was subjected to a hostile work environment based on or motivated by her race. "In seeking to establish the existence of a hostile work environment, [the] plaintiff[] must show that [her] work environment was both objectively and subjectively offensive—that is, 'one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Ellis v. CCA of Tenn. LLC,* 650 F.3d 640, 647 (7th Cir. 2011) (citation omitted). "To survive summary judgment on a hostile work environment claim," Anderson must demonstrate that there are material issues of fact as to whether: "(1) [s]he was subject to unwelcome harassment; (2) the harassment was based on h[er] race; (3) the harassment was severe or pervasive so as to alter the conditions of [her] work environment by creating a hostile or abusive situation; and (4) there is a basis for employer liability." *Smith v. Northeastern Ill. Univ.,* 388 F.3d 559, 566 (7th Cir. 2004) (citation omitted). For many of the reasons already discussed in the context of her discrimination claim, this claim also fails for lack of evidence.

---

[14] It is worth noting here as well that even if Anderson had established a prima facie case of discrimination under the indirect method, there is no evidence to support the contention that she would ultimately be required to prove, namely that her termination for unauthorized absence was pretextual. Indeed, Anderson has admitted in her Local Rule 56.1 responses that none of the individuals she identifies as having been involved in the termination decision (Rohan, Jones, and Golden) recommended termination because of her race. *See* Pl.'s 56.1 Resp. ¶ 49 ("At no time did Rohan consider race in making any decision regarding Plaintiff's discipline or termination."); ¶ 58 ("Jones recommended that she be terminated because she violated the CBA due to her unauthorized absence in August 2011."); ¶ 73 ("At no time did Golden consider race in making any decision regarding Plaintiff's discipline or termination.")

As a threshold matter, Anderson's "hostile work environment" claim is, in fact, no different than her discrimination claim. Its premise is that she was exposed to a hostile work environment because she "was subjected to terms of employment, which her white counterparts were not exposted [sic] to." Pl.'s Resp. at 10. Allegations that white employees were treated better are claims of discrimination, not hostile work environment, and those claims fail for the reasons discussed above.

In any event, even if Anderson could show that there is a genuine dispute as to whether she was subjected to harassment—which is doubtful given the legitimate explanations the defendant has established for Anderson's treatment at work—Anderson presents no evidence to support any argument that she was the subject of harassment *based on her race*. In fact, the section of Anderson's response brief devoted to her hostile work environment claim does not even mention her race. *See* Pl. Resp. at 10-11. Rather, Anderson points to stress, excessive discipline, criticism, suspensions, and differing conditions of employment compared to her "male counterparts," which in combination resulted in her "anxiety and depression which forced her to take a leave of absence from work …." *Id.* Without any connection to her race, Anderson's hostile work environment claim must fail. *See Luckie v. Ameritech Corp.*, 389 F.3d 708, 713-14 (7th Cir. 2004) (holding that supervisor's comments to plaintiff were not "sufficiently connected to race so as to satisfy the second element of the hostile environment analysis" and adding that the "conduct at issue must have a racial character or purpose to support a hostile work environment claim.").

Summary judgment is therefore granted in the defendant's favor on Anderson's hostile work environment claim.

## C. Retaliation (Count II)

Finally, Anderson claims that she was retaliated against for filing charges of discrimination with the EEOC (one in 2007, a second in 2008, and a third in 2011), and arguably for filing an internal complaint against Jones in February 2011.[15] First Am. Compl. ¶¶ 33-37; Pl. Resp. at 12-13. Title VII makes it unlawful for an employer to discriminate against an employee because she has complained about prohibited discrimination. *See* 42 U.S.C. § 2000e–3(a). With respect to her retaliation claim, Anderson asserts that she is proceeding under the direct method, which requires "proof that (1) the employee engaged in statutorily protected activity; (2) she suffered an adverse employment action; and (3) a causal link exists between the two." *Majors v. Gen. Elec. Co.,* 714 F.3d 527, 537 (7th Cir. 2013) (citing *Nichols v. S. Ill. Univ. Edwardsville,* 510 F.3d 772, 784–85 (7th Cir. 2007)). To establish a causal link, the plaintiff must show that her protected activity was a "substantial or motivating factor" in the adverse employment action. *Milligan v. Bd. of Trs. of S. Ill. Univ.,* 686 F.3d 378, 388 (7th Cir. 2012).

Anderson's retaliation claim focuses on two main events. The first is when Anderson filed "numerous grievances" against her supervisor, Ore Jones, as discussed above, *supra*, at 4. In February 2011, Anderson complained to her employer that Jones made "negative and inappropriate statements" about Anderson during a staff meeting, "constantly belittle[d] and ma[de] illicit [sic] statements about co-workers and even to children [sic]," refused to give her a timesheet, and refused to relinquish her pay stub. Dkt. 48-5 at 14-15. The deputy director of the JPD concluded that Anderson's allegations against Jones were unfounded and recommended corrective action against Anderson "for bringing inappropriate and slanderous charges against

---

[15] Anderson does not allege in her First Amended Complaint that the suspension was retaliation for her grievance against Jones, but Anderson does argue in her brief opposing summary judgment that this event falls under her retaliation claim.

DCPO Jones. She has submitted several slanderous memorandums [sic] which contain false or inaccurate accusations and are intended to defame the character of her co-workers." *Id.* at 16. The JPD ultimately concluded that Anderson intentionally defamed the character of Jones and that this was "egregious unprofessional behavior and conduct unbecoming an officer." *Id.* at 18-19. As a result, the JPD suspended Anderson for five days without pay. *Id.* at 19.

As to this first incident, Anderson did not engage in a statutorily protected activity. "Although filing an official complaint with an employer may constitute statutorily protected activity under Title VII, the complaint must indicate the discrimination occurred because of sex, race, national origin, or some other protected class." *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006) (citation omitted). "Merely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient." *Id.* According to the record before this Court,[16] Anderson complained to her employer about comments and treatment by Jones that bothered her, but Anderson offers no evidence that any of the complained-of conduct related to her race. Rather, her complaints appear to be related to communication and personal issues between Anderson and her supervisor. Anderson has therefore not created an inference, or a genuine dispute, that she engaged in the statutorily protected activity of complaining about discrimination on the basis of her race, and that she then suffered retaliation for those complaints.

The second event on which Anderson's retaliation claim is based—at least so far as it is alleged in her complaint—is her filing of charges of discrimination with the EEOC, once in

---

[16] The record does not contain the written complaints Anderson submitted to her employer regarding her treatment by Jones. However, in her deposition testimony about her complaints against Jones, Anderson did not refer to race or suggest that she was complaining of discrimination by Jones that occurred because of her race.

2007, again in 2008 and most recently in April 2011. This is clearly a statutorily protected activity. *See Tomanovich*, 457 F.3d at 663 (filing a charge of discrimination with the EEOC satisfies the first element of a retaliation claim). The defendant concedes, as it must, that Anderson's ultimate termination was an adverse employment action. As to the third element, causation, however, Anderson falls far short.

As an initial matter, Anderson has waived the argument that she was terminated in retaliation for the filing of any of the three EEOC complaints she filed over the course of four years because she has failed to develop any such argument in her brief. Her brief states only that she filed EEOC complaints in 2007, 2008, and April 2011 and was terminated in August 2011; it contains no argument whatsoever to establish a causal link between those events and cites no facts that might do so.[17] The defendant's brief addresses this issue, arguing that there is no such link, and Anderson's response does not take issue with that argument. Accordingly, Anderson has waived the argument. *See Bonte v. U.S. Bank , N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument—as the [plaintiff] has done here—results in waiver.").

Reinforcing the conclusion that she has waived the EEOC retaliation argument, Anderson offers no argument that Rohan or Golden sought to retaliate against her; rather, she acknowledges that race played no role at all in their decisions to terminate her. Pl. 56.1 Resp. ¶¶ 49 and 73. She does claim that Jones sought to retaliate against her, but she does not say for

---

[17] "[S]uspicious timing alone rarely is sufficient to create a triable issue … [M]ere temporal proximity is not enough to establish a genuine issue of material fact." *Tomanovich*, 457 F.3d at 665 (citation and internal quotation marks omitted). Here, four months elapsed between the time Anderson filed her 2011 charge with the EEOC and her termination. In other cases in this circuit, a span of time of four months failed to establish a causal connection between the protected activity and an adverse action. *Id.* (citing as example *Longstreet v. Ill. Dep't of Corr.*, 276 F.3d 379, 384 (7th Cir. 2002)). And of course, the timing of her other EEOC complaints— three and four years before her termination—undermines any inference that she was terminated based on those complaints.

what and she admits that Jones (like Golden) recommended her termination "because she violated the CBA due to her unauthorized absence in August 2011." *Id.* ¶¶ 58 and 72. What is more, her brief also fails to establish that any of the three individuals she identifies as having been involved in the decision to fire her even knew that she had filed the April 2011 EEOC charge. Indeed, she filed that charge in April and spent little time at work thereafter: she served two suspensions, totaling 17 work days, in April and May, and she was absent from work from June 28 through August 1, when she remained at work only long enough to find out that supervisors wanted to meet with her to discuss her performance, and then left again and did not return, so it is anything but self-evident that Rohan, Golden, or Jones knew about her complaint. Neither Anderson's responses to the defendant's fact statement, nor her own statement of additional facts, provides any information from which it can be inferred that anyone at JPD knew of the complaint.

Even looking beyond her brief to her complaint, Anderson fails to provide a credible, much less persuasive, basis to infer that her termination was in retaliation for filing an EEOC charge. She alleges in her amended complaint that "[n]o other events took place between April of 2011 … and August of 2011 … that would serve as a basis for the Plaintiff being terminated from her employment …." First Am. Compl. ¶ 38. Putting aside the fact that it is the plaintiff's burden to prove retaliation, not the employer's burden to disprove it, *see Smart v. Ball St. Univ.*, 89 F.3d 437, 439 (7th Cir. 1996), Anderson's statement is simply untrue. There was, in fact, a critical event that took place after she filed her EEOC charge that justified her termination: Anderson left work on August 1, 2011, without authorization or accrued leave, and never returned. Anderson's bald allegation that there is no other explanation for her termination is not

even marginally persuasive and does not begin to show that Anderson's protected activity was a "substantial and motivating factor" for her termination.

As to the two charges of discrimination Anderson filed with the EEOC in 2007 and 2008, Anderson again does not establish a causal link between them and her termination in 2011. She attempts to establish a link between the 2008 charge and her transfer to Juvenile Probation, but she does not allege that the transfer was an adverse employment action. In fact, Anderson admits that the transfer was pursuant to a settlement agreement with her employer and that the director of the department knew no details of the previous lawsuit. Pl. Resp. at 12-13; Pl. 56.1 Resp. ¶ 11; Def. 56.1 Resp. ¶ 39.

Summary judgment is therefore granted in the defendant's favor for Anderson's retaliation claim.

*     *     *

As set forth above, Anderson has failed to adduce sufficient evidence to survive summary judgment on her claims for racial discrimination, hostile work environment, and retaliation. Accordingly, the defendant's motion for summary judgment is granted in its entirety.


Entered: September 3, 2014

_____
John J. Tharp, Jr.
United States District Judge